Andrew M. Kohlmetz, OSB #955418
Kohlmetz Steen & Hanrahan PC
741 SW Lincoln Street
Portland, OR 97201
Tel: (503) 224-1104
Fax: (503) 224-9417
Email: andy@kshlawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SAMUEL DOW HOWARD, JR.,<br><br>　　　　Defendant. | Case No. 3:14-cr-00032-001-JO<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>(Sentencing Scheduled for February 18, 2015, at 10:00 a.m.) |

## I.   Introduction

On November 12, 2014, Mr. Howard pled guilty to count 1 of the Indictment herein charging him with violating the Mann Act for the transportation of an adult across state lines with the intent that the person engage in Prostitution. The plea was entered into pursuant to a written plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(B).

.

## II.    Guidelines Calculations

The PSR accurately describes the Guidelines calculations herein and reflects the parties' agreement to jointly recommend an additional one level equivalent downward variance in the guidelines range in exchange for Mr. Howard's early and uncontested resolution of this matter.

### A.  One level equivalent variance for early disposition

At the change of plea hearing on November 12, 2014, the Court indicated that it was dubious of the joint recommendation of a one level equivalent variance for early disposition in this case. Ms. Beckerman, then representing the government informed the court that in her view the adjustment was appropriate given the voluminous discovery in this case. Although the this case was indicted on January 23, 2014, Mr. Howard did not make his initial appearance until February 26, 2014. Discovery was undertaken shortly thereafter. Discovery production was not completed until early October of 2014. The total discovery production consisted of 52 separate CD's with over 53,000 Bates stamped pages. Hundreds of hours of body wire and phone recordings were included. Thousands of pages of internet, computer, travel, cell phone and bank records were produced. Counsel for the government and the defense worked closely over the course of the production to ensure the information was being delivered and processed expeditiously. Given the volume and nature of the discovery materials both sides felt it appropriate to keep the initial plea negotiations open at least until all the relevant discovery had been produced and reviewed. Mr. Howard entered his change of plea approximately one month after the discovery production was complete. In addition to his rapid change of plea, Mr. Howard also elected not to litigate any pre-trial motions.  It has been the longstanding practice in this District for such variances of 1 or

even 2 levels to be recommended and granted. The variance is appropriate in this case and the defense asks the Court to follow the recommendations of the parties thereon.

Applying the jointly recommended variance the defendant's sentencing range is 12-18 months in the custody of the Bureau of Prisons.

### III.    Defendant's Sentence Recommendation

By and for the reasons that follow Mr. Howard respectfully asserts that a sentence of probation is appropriate in this case. Such a sentence is no longer than necessary to achieve the multiple purposes of the Sentencing Reform Act as listed at 18 USC 3553(a).

#### A. The government's sting operation produced unreliable evidence in this case

In May of 2013, the government set up an elaborate sting operation with a cooperating informant, "RW". RW posed as a movie producer who was engaged in scouting talent for the fictitious company "Gamechanger LLC." RW falsely claimed to be producing the film "American Pimp II."  RW marketed the phony production of American Pimp II as the sequel to the underground documentary classic "American Pimp." American Pimp was a legitimate Hollywood documentary produced in 1999. It was introduced that year at the Sundance Film Festival Documentary Competition. It was directed by Albert and Allen Hughes – two famous, high-profile African-American directors and brothers, also credited with the major films "Dead Presidents" and "Menace II Society." The film features and in many ways glorifies a stereotyped "pimping lifestyle" through  interviews of flamboyant  pimps with street names such as  Filmore Slim, C-Note, K-Red, Gorgeous Dre, and Rosebud. In the film these self-identified pimps and

prostitutes discuss their lifestyle and openly flaunt their cash, fancy clothes, cars and other accoutrements of this now stereotyped criminal lifestyle.

RW put the word out on the street that he was looking to interview and photograph local pimps and prostitutes to be featured in the film. He made arrangements for a professional model photography shoot with a local "erotic glamour" studio, "Hypnox" Studios. These sessions were marketed by RW as auditions for possible inclusion in the upcoming film. Phony "engagement" contracts were drawn up and signed by the participants. RW promised these prospective "pimps" $1,000.00 to participate in these interviews and photo shoots. The "prostitutes" were told they could retain the "glamour photographs" and use them as they saw fit after the shoot. In her May 31, 2013, photo shoot with RW and the photographer, TC remarked without prompting that she had been wanting a professional photo portfolio from Hypnox Studios for the last two years.

RW wined and dined those who responded to his casting call. Mr. Howard heard of the scheme from his brother and reached out to the government informant on May 15, 2013. Over the next couple of months. Mr. Howard and Ms. Caldwell were treated to meals at Stanford's and at the Ringside while RW discussed the movie with them and asked them about their lifestyle.

Mr. Howard played the role that any aspiring movie star would. The government informant RW paid him $1,000.00 for his story. This was not just a one-time payment. At their May 31, 2013, meeting RW told Mr. Howard that the $1,000.00 was really an advance on the salary he would negotiate later for his role in the upcoming film. The government was selling Mr. Howard the idea that he was going to be a paid movie star. Mr. Howard wanted to make the

cut and get in the movie. In an effort to see to it that he made the film he did what any aspiring actor might: He embellished and exaggerated his "career" as a pimp. All of Mr. Howard's statements regarding his supposed pimping history were recorded by RW either over the phone or by body wire. All of his supposed pimping exploits were investigated. With the exception of his involvement with TC in this case, none of the information he provided yielded any further investigative results or criminal charges. His statements to RW, relied upon in the PSR for much of the basis behind the conclusions that Mr. Howard was for years an active pimp miraculously avoiding detection by law enforcement are not borne out in fact. He was simply self-promoting himself for an easy $1,000.00 payday and the chance to become a movie star and something of a local hero.

TC was promised by RW that she could use the photos from their shoot for on line "marketing" on the internet for her escort services. RW also told Mr. Howard and TC that these photos would be used for posters and to promote the movie. The photo shoot (referenced in the PSR at paragraph 18) was explicitly designed by the government informant to depict "pimps" and "ho's." Both Mr. Howard and TC changed from their street clothes into the costumed outfits they wore for the shoot. The entire shoot was staged at the government's direction. Hundreds of photos were taken. Their evidentiary value is negligible, yet viewing the photographs is exceptionally prejudicial the defendant and TC.

If Mr. Howard's statements to RW had proven accurate then the government's investigation would have borne that out. The evidence simply does not bear out the implications contained in the PSR that Mr. Howard is deserving of more punishment because he got away with a lot of other unlawful activities. If it did Mr. Howard would be facing more serious charges

DEFENDANT'S SENTENCING MEMORANDUM - 5

or an enhanced sentence like others caught up in this investigation. Like the photographs, the staged and embellished statements of Mr. Howard have very little evidentiary value. Yet they are also extremely prejudicial as they describe activities which if true would support additional charges. The government should not on the one hand encourage, entice and pay Mr. Howard to embellish tales of outrageous acts of pimping by selling him on the possibility of becoming a movie star, and then turn around and point to those statements and photos as reliable evidence of his actual criminal wrongdoing.  He should not be punished for simply being under suspicion after trying to sell an inflated story to a government huckster who promised him fame and fortune in return for his exaggerated tales.

### B. The offense conduct was less harmful than typical

TC is the listed victim in this one count Indictment. Sam Howard is and was TC's boyfriend, not her "pimp" as that word is commonly used. TC has in the past referred to him as her "boyfriend pimp." The distinction is important as it connotes a less-egregious relationship than that typical in human trafficking cases. TC was an active prostitute when she met Mr. Howard. She remained so after they became romantically involved. Even after both have been separately indicted for prostitution related charges, they are still together. In fact, they are engaged to be married. After pleading guilty in this case, both were allowed to once again have contact with each other. TC is now pregnant and expecting a child. Mr. Howard and TC intend for Mr. Howard to be the father to the child.

While Mr. Howard has always been aware and even supportive of TC's prostitution career, he did not act as a pimp in the routine sense. He has traveled out of state with her while she prostituted. He has assisted her and he has shared in her earnings on occasion. While together they shared in many things, as many couples do. However, he did not recruit her into prostitution. He did not isolate her from her friends and family. He did not threaten or coerce her in any fashion to engage in prostitution. He never physically or psychologically abused her in any way. Mr. Howard's statements to RW that he was TC's pimp in the traditional sense are not borne out in the government's investigation in either Mr. Howard's or TC's criminal case.

According to various law enforcement reports in TC's case: In 2012 law enforcement agents identified TC as a member of a criminal association that went by the name Royal Family Pimp Gang or Royal Family Party Girls. A number of so-called pimps and prostitutes were identified as being members of this group. During the investigative timeframe of approximately 2012 – 2013, various members of the group, including TC, traveled to a variety of states throughout the U.S. to engage in prostitution related activities. None of the reports or witnesses in the investigation of the RFPG identified Sam Howard as being involved in the groups' activities. In fact, a number of witnesses stated that TC's pimp was not Sam Howard but another individual altogether.

In May and June of 2012, a cooperating prostitute met with law enforcement to provide them with information concerning RFPG. She gave detailed information relative to TC with whom she had much contact. She informed case agents that TC's pimp was not Sam Howard but an individual named Timothy Walker. This information was corroborated in an interview with another sex trafficking victim "DH" who was interviewed by law enforcement in September of

DEFENDANT'S SENTENCING MEMORANDUM - 7

2012. DH had direct contact with TC and engaged in prostitution related activities with her. She identified TC's pimp as "Timothy" (Timothy Walker) and not Samuel Howard. Sam Howard's role in this case as TC's "boyfriend pimp" is far less egregious than typically seen in human trafficking cases.

Mr. Howard's case falls outside the "heartland" of typical sex trafficking cases and a downward departure or variance is appropriate. U.S.S.G. § 5K2.0, Rita v. United States., 127 S.Ct. 2456 ( 2007) (sentencing court may consider disregarding the Guidelines sentence where the case falls outside the "heartland" to which the Commission intends individual Guidelines to apply), and United Sttes v. Parish 308 F.3d 1025, 1030-31 (9th Cir. 2002).

**C. Other defendants caught up in this sting received greatly reduced sentences and/or charge reductions**

Many others met with RW in this phony American Pimp II endeavor. Often investigative leads proved fruitful. After these suspected pimps met with RW and described their prostitution-related lifestyles, law enforcement thoroughly investigated their statements. Where charges could be brought they were, even if only used as leverage in plea negotiations. For example, in the case of Michael Willis (14-cr-00033-MO), Mr. Willis was charged with Sex Trafficking by Force or Coercion, a 15 year mandatory minimum offense. He has plead guilty to two counts of violating the Mann Act. While the plea agreement he reached contemplates an upward variance from the Transportation Mann Act level guidelines, he no longer faces the 15 year mandatory minimum for the offense involving force and /or coercion.

Steve Huffman (14-cr-00034-MO) Indicted for the trafficking of one adult, also provided to information to RW that led to threatened charges of Sex Trafficking by Force or Coercion against a second victim. Mr. Huffman remains to be sentenced, but his plea agreement calls for a government recommended cap of 60 months incarceration on one count of violating the Travel Act.  . Similarly, in the case of Camillio Carradine (14-cr-00025-SI). Mr. Carradine's paid "audition" with RW led to his being charged with Sex Trafficking of a Minor. Charges involving at least three other victims were also threatened. He too was allowed to plead out to a lesser charge of violating the Mann Act, and despite victimizing at least 4 women, at least one of whom was a minor Mr. Carradine's plea agreement calls for a joint recommendation fora 70 month prison term. This is less than half the 15 year mandatory minimum as to the single minor victim.

Despite his boastful accounts of years in "the game" and multiple women in "his stable" Mr. Howard's charges remained those that could be corroborated: His non-forceful, non-coercive involvement with TC that supported only the Mann Act and Travel Act violations contained in this Indictment. While some defendants in related cases have negotiated resolutions far below the otherwise applicable mandatory minimum sentences, Mr. Howard receives far less in exchange for his plea of guilty. He is less culpable than those defendants charged with the trafficking of minors, or of trafficking through force or coercion. Yet in relative terms, those more predatory individuals are receiving far greater benefits in exchange for their pleas.  A downward variance to a probationary sentence in Mr. Howard's case is an appropriate vehicle by which to avoid any disparity in the treatment of these various defendants. See <u>Gall v. United States</u>, 128 S. Ct. 586, 600 (2007), <u>Kimbrough v. United States</u>, 128 S. Ct. 558 (2007), <u>Rita v. United States</u>, 127 S. Ct. 2456 (2007).

**D. Mr. Howard's criminal history overstates his criminality and the likelihood he will reoffend**

Of his 5 criminal history points 2 come from a drug related conviction in 2005. Although he had one probation violation Mr. Howard was able to ultimately complete the conditions of his probation, including drug treatment. There have been no drug-related convictions in the ten years since.  As noted in the PSR at paragraphs 62-65 Mr. Howard has had a long struggle with alcohol and drug dependence. His lack of intervening drug related convictions in the intervening 10 years despite these addiction issues is remarkable. He remains in need of treatment and his prior successful history of completing probationary sentences is evidence that he can succeed with monitoring in the community.

2 of Mr. Howard's criminal history points are attributed to minor driving offenses from 2007 and 2009.  (Paragraphs 42, 43). He has no convictions for any crimes of violence. He has no convictions for any crimes of a sexual nature. It has been more than 5 years since his last conviction, a reckless driving charge. It has been almost 10 years to the day since his last felony conviction. This is significant conviction free period and should be taken into account in mitigation of his sentence herein. A downward departure is authorized by U.S.S.G. §4A1.3(b)(1), and/or a sentencing adjustment under §3553(a) is also appropriate. See United States v. Brown, 985 F.2d 478 (9th. Cir. 1993), United States v. Lawrence, 916 F.2d 553 (9th. Cir. 1990).

**E. Mr. Howard is engaged in community programs that foreshadow future success in the community**

Since the Fall of 2014 Mr. Howard has been actively involved in the Highland Access Reentry and Recovery Program "HARRP." HARRP is a local church based community organization established at the Highland United Church of Christ in 2009 to assist people transitioning out of prison back into our local community. According to HARRP's website:

> HARRP's goals are to help people coming out of prison become successful, reunite with their loved ones and stay out of prison. We work primarily with people being released into the Portland Metro Area. HARRP also provides counseling and support to the families of incarcerated, recovery support and spiritual counseling.[1]

Mr. Howard has been engaged in HARRP's mentoring program. His mentor is Ronald Williams, a minister at the church who has known Mr. Howard since he was a child. Mr. Williams confirms that Mr. Howard is engaged in the program and participates in weekly Bible study groups. Mr. Howard also participates in the church's monthly "Burnside Feed" in which church members come to downtown Portland to donate food and clothing and offer spiritual counseling to the homeless.

Mr. Howard has also recently completed the "Freedom Road" cognitive skills building program offered through HARRP. This program was created over twenty years ago by Highland Church

---

[1] http://harrp.org/ as reviewed February 12, 2015.

member Robert Fentress who was then serving a "life" sentence in the Oregon State Penitentiary.

According to Mr. Fentress:

> I wrote Freedom Road, a cognitive skills and empowerment program designed to train youth and adults to improve the quality of their life through better choices. Focusing on crime prevention and re-entry, the curriculum prepares participants to recognize and understand the requirements of living a community focused lifestyle.
>
> I approached the prison administration to see if I could form a speaking panel of inmates and present this information to at risk youth, and other programs in the visiting room of the penitentiary. The program proved to be very successful for youth, adults, and participating inmates. Over thirty schools and youth organizations participated and the results were (are) phenomenal.
>
> Now, twenty (20) years later, I continue presenting this information as Freedom Road partners with community organizations, state agencies, churches, and schools in an effort to provide at risk youth, adults in re-entry, and recovery with the skills necessary to become productive members of our communities.[2]

Mr. Howard has also been attending a cognitive thinking group at Lifeworks NW. He is due to graduate this program on February 17, 2015. Mr. Howard's involvement in self-help and community based personal betterment programs are another indicator that he is suitable for monitoring in the community and is ground upon which this court can rest a decision to grant a probationary sentence herein.

---

[2] http://harrp.org/freedom-road/ as viewed February 12, 2015

### F. Mr. Howard endured a horrific child hood.

As briefly described in the PSR at paragraphs 51-54 Mr. Howard endured a horrific childhood. His parents were both strung out on heroin. Sam and his siblings were subjected to open drug use by his parents. Strangers often came and went from the house. He endured episodes of domestic violence between his parents. He suffered through long periods of parental absence as both parents cycled in and out of jail and prison. His mother, who passed in 2012 after a long struggle with cancer, had a lengthy conviction history with criminal convictions dating from the 1980's for Delivery and Possession of Controlled Substances, Unlawfully Obtaining Public Assistance, Child Neglect, Forgery, Theft and Prostitution. His father too had multiple convictions during Mr. Howard's childhood for Delivery and Possession of a Controlled Substances, Forgery and Escape. The family was receiving public assistance, but often the money was spent on the parents' drug habits and not for rent, food or clothing for the children. The family moved from subsidized housing to subsidized housing frequently as a result of his parents' behaviors. For much of his childhood Sam was either in the care of relatives or was left to fend for himself and his three younger siblings. Even when his parents were present they were generally not capable of adequate parenting by any measure. Oregon Department of Human Services removed Sam and his siblings from his parents' custody in the early 1990's due to his parents' inability to care for their children. His parents' troubles continued through his childhood and into his early adult life.

In October of 2005, shortly after being released from a 5 year prison sentence, his father accepted a $871,000.00 dollar lump sum payment after winning the Oregon Lottery. Mr. Howard's parents once again descended into rampant drug use and crime. The Howard's bought

a home in Oregon City in July of 2006 which quickly became a notorious flop house and nuisance. According to a nuisance lawsuit brought by the City against his parents, police were called to the residence on 52 occasions in a four month span in 2006. Mr. Howard once again was traumatized by the degradation of his parents.

That Mr. Howard suffered exceptional physical, emotional and psychological abuse as a child is without question. Such circumstances have long been recognized by the courts as affecting a person through their adult life. As Justice Rehnquist long ago remarked:

> It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens. The same can be said of children who, though not physically or emotionally abused, are passed from one foster home to another with no constancy of love, trust, or discipline. *Santosky v. Kramer*, 455 U.S. 745, 789, 102 S.Ct. 1388, 71 L.Ed 2d 599 ( 1982)(Rehnquist, J., dissenting.)

Such exceptional abuse is also recognized by the federal courts as a basis for a downward departure or downward variance. *See for example, United States v. Mc Bride, 511 F.3d 1293 (11th Cir. 2007), United States v. Walter, 256 F.3d 891 (9th Cir. 2001)*, and *United States v. Brown, 985 F.2d 478 (9th Cir. 1993).* Mr. Howard, as an adult, is very much a predictable reflection of his horrendous upbringing. Yet despite his horrific history, Mr. Howard in many respects has demonstrated a remarkable ability to right his course when he has erred. A downward variance in his sentence is appropriate.

### G. Mr. Howard is an active and engaged parent to his own children

Mr. Howard is the proud father of six children. He is actively involved in all of their lives. He sees all of them as often as he can, typically each and every weekend. He pays child

support to all of their mothers and is on a 5 year payment plan with the State of Oregon. He is current with his plan. He is dedicated to being the family, financial and emotional resource to his children that his parents never were in his own life.

Mr. Howard has been consistently employed during his adult life. His most consistent was with Freightliner between 2008 and 2011. He is still employed through Pinnacle Work Force which is a national skilled temporary worker employment agency. His jobs through Pinnacle typically pay $14.00 per hour. Although his positions are usually temporary ones, he finds work consistently enough to ensure he meets his own living expenses as well as meeting his child support obligations. This is a remarkable feat considering he is a convicted felon. His strong work and family ethic demonstrate that he is worthy of a probationary sentence herein.

## CONCLUSION

For all of the reasons outlined above the defense requests that this court sentence Mr. Howard to a three year term of probation with all standard conditions. Such a sentence is no longer than necessary to achieve the multiple purposes of the Sentencing Reform Act as listed at 18 USC 3553(a).

Dated this 13th day of February, 2015.

*Andrew M. Kohlmetz*
Andrew M. Kohlmetz
Kohlmetz Steen & Hanrahan PC
741 SW Lincoln Street
Portland, OR 97201
Attorney for Defendant